Hamilton, Circuit Judge.
 

 In 2015, the Village of University Park's mayor and board fired police chief Eddie Ray Bradley without any notice of good cause or any form of hearing-i.e., the procedural protections owed to Bradley under the United States Constitution. Bradley sued the village and mayor in federal court under
 
 42 U.S.C. § 1983
 
 for violating his Fourteenth Amendment rights by depriving him of a property interest in his job without due process of law. He also asserted several state-law claims. The district court dismissed Bradley's federal due process claim on the pleadings. We reverse.
 

 The parties agree that Bradley had a protected property interest in his continued employment. They agree that the mayor and the village board are the policymakers for their municipality on the subject. And everyone agrees that although there was ample opportunity for a hearing, Bradley received no pretermination notice or hearing. Those points of agreement suffice to prove a due process claim under § 1983 against the individual officials and the village itself, where the village acted through high-ranking officials with policymaking authority. See, e.g.,
 
 Cleveland Bd. of Education v. Loudermill
 
 ,
 
 470 U.S. 532
 
 , 542,
 
 105 S.Ct. 1487
 
 ,
 
 84 L.Ed.2d 494
 
 (1985) ;
 

 Pembaur v. City of Cincinnati
 
 ,
 
 475 U.S. 469
 
 , 485,
 
 106 S.Ct. 1292
 
 ,
 
 89 L.Ed.2d 452
 
 (1986) ;
 
 Monell v. New York City Dep't of Social Services
 
 ,
 
 436 U.S. 658
 
 , 694,
 
 98 S.Ct. 2018
 
 ,
 
 56 L.Ed.2d 611
 
 (1978).
 
 [1]
 

 The defendants seek to avoid this straightforward conclusion. They urge us to follow a line of cases that excuses liability for the absence of predeprivation due process if the deprivation is the result of a "random, unauthorized act by a state employee, rather than an established state procedure," and "if a meaningful postdeprivation remedy for the loss is available."
 
 Hudson v. Palmer
 
 ,
 
 468 U.S. 517
 
 , 532-33,
 
 104 S.Ct. 3194
 
 ,
 
 82 L.Ed.2d 393
 
 (1985), citing
 
 Parratt v. Taylor
 
 ,
 
 451 U.S. 527
 
 , 541,
 
 101 S.Ct. 1908
 
 ,
 
 68 L.Ed.2d 420
 
 (1981), and
 
 Logan v. Zimmerman Brush Co.
 
 ,
 
 455 U.S. 422
 
 ,
 
 102 S.Ct. 1148
 
 ,
 
 71 L.Ed.2d 265
 
 (1982) ; see also
 
 Easter House v. Felder
 
 ,
 
 910 F.2d 1387
 
 (7th Cir. 1990) (en banc). Defendants reason that because the village's top officials decided as a matter of village policy to deny an employee due process in a way that also violated state law, their policy decision should be treated as a "random and unauthorized act ... beyond the control of the State,"
 
 Parratt
 
 ,
 
 451 U.S. at 541
 
 ,
 
 101 S.Ct. 1908
 
 , leaving Bradley to pursue remedies only under state law. In other words, defendants argue that by intentionally violating plaintiff's federal due process rights in a way that also violated state law, they insulated their actions from federal liability.
 

 This argument is foreclosed for several reasons. First, the Supreme Court has never suggested that the pragmatic but narrow rule of
 
 Parratt
 
 applies to employee due process claims where predeprivation notice and an opportunity to be heard could be provided in a practical way. Public employers' decisions to violate both state and federal procedural requirements have never been treated as grounds to excuse federal due process liability. In addition, in this case, the decision to fire Bradley was made by the top municipal officials. This court has held squarely that "a complaint asserting municipal liability under
 
 Monell
 
 by definition states a claim to which
 
 Parratt
 
 is inapposite."
 
 Wilson v. Town of Clayton
 
 ,
 
 839 F.2d 375
 
 , 380 (7th Cir. 1988). That holding is consistent with other circuits and accords with common sense. A municipality cannot be held liable under a respondeat superior theory of liability. It can be held liable for a constitutional violation only if the violation resulted from a formal policy, an informal custom, or a decision "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."
 
 Monell
 
 ,
 
 436 U.S. at 691
 
 , 694 & n.58,
 
 98 S.Ct. 2018
 
 . In cases alleging due process violations by municipal policymakers, there is no need to inquire separately into whether an employee's actions were "random and unauthorized."
 

 In addition, defendants' expansive interpretation of
 
 Parratt
 
 ,
 
 Hudson
 
 and
 
 Easter House
 
 is at odds with the Supreme Court's explication of
 
 Parratt
 
 and
 
 Hudson
 
 in
 
 Zinermon v. Burch
 
 ,
 
 494 U.S. 113
 
 , 124,
 
 110 S.Ct. 975
 
 ,
 
 108 L.Ed.2d 100
 
 (1990), which explained that the Court had "rejected the view that § 1983 ... does not reach abuses of state authority that are forbidden by the State's statutes or Constitution or are torts under the State's common law," and that "overlapping remedies
 are generally irrelevant to the question of the existence of a cause of action under § 1983."
 

 Excusing top municipal officials from federal liability when they violate constitutional due process rights, so long as they also violate state laws and the state provides some post-deprivation recourse, would (1) undermine public employees' due process rights and remedies under
 
 Loudermill
 
 and its progeny; (2) conflict with
 
 Monroe v. Pape
 
 ,
 
 365 U.S. 167
 
 ,
 
 81 S.Ct. 473
 
 ,
 
 5 L.Ed.2d 492
 
 (1961), and its progeny, which hold that a state or local official may be sued under § 1983 for actions taken "under color of state law" even though the official's actions also violate state or local law and a remedy exists under state law; and (3) conflict with
 
 Patsy v. Board of Regents
 
 ,
 
 457 U.S. 496
 
 , 500-01,
 
 102 S.Ct. 2557
 
 ,
 
 73 L.Ed.2d 172
 
 (1982), which held that § 1983 plaintiffs need not exhaust state-law remedies before asserting their federal rights. There is no indication in
 
 Parratt
 
 ,
 
 Hudson
 
 ,
 
 Zinermon
 
 , or our en banc decision in
 
 Easter House
 
 of an intention to undermine or overrule so much bedrock § 1983 law or to intrude on
 
 Monell
 
 doctrine in cases against municipalities. Those decisions should not be read to provide a defense to Bradley's due process claim.
 

 Where predeprivation procedures are both required and practicable, municipal policymakers expose the municipality and themselves to liability under § 1983 if they deliberately disregard an individual's constitutional due process rights. This is true even when state law also offers postdeprivation remedies. We therefore reverse the judgment of the district court and remand for further proceedings.
 

 I.
 
 Factual Background and Procedural History
 

 In 2013, plaintiff Bradley became the police chief of the Village of University Park, Illinois. Soon after a municipal election in 2015, however, the mayor and village board placed Bradley on administrative leave. Thirteen days later, they fired him summarily, without giving him any notice of good cause or any opportunity to be heard.
 

 The letter terminating Bradley did not try to justify his firing based on any sort of good cause. It suggested that he was being ousted by operation of state law because his employment contract extended his tenure beyond the term of the village officeholders who had appointed him, citing 65 Ill. Comp. Stat. 5/3.1-30-5(c) & 5/8-1-7(b), and
 
 Millikin v. Edgar County
 
 ,
 
 142 Ill. 528
 
 ,
 
 32 N.E. 493
 
 (1892). This meant, according to the village board, that Bradley's appointment as police chief terminated as of May 15, 2015 without needing a board vote, a statement of reasons, or a hearing. Bradley responded with a letter demanding an opportunity to be heard. He received no answer.
 

 These actions did not comply with the termination provisions of Bradley's employment contract, the requirements of state law, or-critical to this case-the Fourteenth Amendment. To effect Bradley's removal, Illinois state law required the village to follow a process set forth in 65 Ill. Comp. Stat. 5/10-2.1-17. See also University Park, Ill.,
 
 Codified Ordinances
 
 part 2, title 8, § 271-02(g) (adopting in its entirety 65 Ill. Comp. Stat. 5/10-2.1-17 ). This process requires a statement of "the reasons for such removal or discharge," which must be voted on by the village's corporate authorities before the discharge may take effect.
 

 Id.
 

 The process also includes "a fair and impartial hearing of the charges" in front of the village's board of fire and police commissioners.
 

 Id.
 

 These procedures would, if followed, satisfy
 the basic federal constitutional requirement that the village offer its tenured employees notice and an opportunity to be heard before firing them, a right that "does not depend on a demonstration of certain success."
 
 Loudermill
 
 ,
 
 470 U.S. at 542-46
 
 ,
 
 105 S.Ct. 1487
 
 ;
 

 id.
 

 at 544
 
 ,
 
 105 S.Ct. 1487
 
 , citing
 
 Carey v. Piphus
 
 ,
 
 435 U.S. 247
 
 , 266,
 
 98 S.Ct. 1042
 
 ,
 
 55 L.Ed.2d 252
 
 (1978) ; see also
 
 Gilbert v. Homar
 
 ,
 
 520 U.S. 924
 
 , 929,
 
 117 S.Ct. 1807
 
 ,
 
 138 L.Ed.2d 120
 
 (1997) (explaining that minimum constitutional requirements of "pretermination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story").
 

 The mayor and the village board had the authority and discretion to fire Bradley. State law delegated this authority to their offices. See 65 Ill. Comp. Stat. 5/10-2.1-17 (vesting power to remove police chief in "the appointing authority"); University Park, Ill.,
 
 Codified Ordinances
 
 part 2, title 4, § 210-01 (mayor sits on village board);
 

 id.
 

 at title 6, § 220-02 & -05 (village board, which includes the mayor, appoints a municipal manager, and together the board, mayor, and manager appoint and remove police chief).
 

 Bradley sued under § 1983 for deprivation of property without due process of law, naming as defendants the village itself and the mayor in her official and individual capacities. (We need not distinguish between the village and the mayor in this opinion.) He also sought relief under several state-law theories. The village filed an answer admitting that Bradley was fired without any process and asserting several affirmative defenses, including qualified immunity for the mayor in her individual capacity. The village has conceded that Bradley held a protected property interest in his job.
 
 [2]
 

 The district court directed the parties to address the qualified immunity defense and to address our decision in
 
 Michalowicz v. Village of Bedford Park
 
 ,
 
 528 F.3d 530
 
 , 532-33 (7th Cir. 2008), which affirmed dismissal of a federal due process claim by a local fire inspector. Unlike the present case, Michalowicz
 
 had
 
 received hearings both before and after his firing, but he alleged that his hearings did not comply with the detailed procedures required under the state statute. Nonetheless, the district court here rendered judgment on the pleadings and dismissed Bradley's due process claim with prejudice. Dkt. 35 at 3.
 

 The district court reasoned that Bradley simply "attacks the actions, and inactions, of Defendants in the process of firing him" and not the "process available to him under Illinois law" for vindicating his rights.
 

 Id.
 

 This meant, in the judgment of the district court, that "Plaintiff's accusations are that Defendants' actions were 'random and unauthorized' by law,"
 
 id.
 
 at 2, quoting
 
 Michalowicz
 
 ,
 
 528 F.3d at 535
 
 , so that constitutional due process requirements are met as long as a state law remedy "provides for a post-termination hearing."
 

 Id.
 

 The district court found that Bradley's remedy in state court under state administrative law would be adequate and his "choice" not to take advantage of the state administrative process available to him was "fatal to his claim in federal court."
 
 Id.
 
 at 3. The court then dismissed Bradley's remaining state-law claims without prejudice.
 

 II.
 
 Bradley's Federal Due Process Claim
 

 A.
 
 Due Process Basics
 

 Because the district court dismissed Bradley's complaint on the pleadings under Federal Rule of Civil Procedure 12(c) for failure to state a claim, we review the district court's legal conclusions
 
 de novo
 
 , construing the factual allegations in the complaint in the light most favorable to Bradley. E.g.,
 
 Bishop v. Air Line Pilots Ass'n
 
 ,
 
 900 F.3d 388
 
 , 396-97 (7th Cir. 2018).
 

 The basic legal questions presented by due process cases like this are familiar: "(1) is there a property or liberty interest protected by due process; and (2) if so, what process is due, and when must that process be made available?"
 
 Simpson v. Brown County
 
 ,
 
 860 F.3d 1001
 
 , 1006 (7th Cir. 2017) ; see generally
 
 Mathews v. Eldridge
 
 ,
 
 424 U.S. 319
 
 , 333-35,
 
 96 S.Ct. 893
 
 ,
 
 47 L.Ed.2d 18
 
 (1976).
 

 For public employees, a "protected property interest in employment can arise from a state statute, regulation, municipal ordinance, or an express or implied contract."
 
 Crull v. Sunderman
 
 ,
 
 384 F.3d 453
 
 , 460 (7th Cir. 2004), quoting
 
 Johnson v. City of Fort Wayne
 
 ,
 
 91 F.3d 922
 
 , 943 (7th Cir. 1996). We need not dwell on this element. As noted, the village concedes that Bradley had a property interest in his job protected by procedural due process. His protections were not just procedural but substantive. Cf.
 
 Manley v. Law
 
 ,
 
 889 F.3d 885
 
 , 893 (7th Cir. 2018) (purely procedural rules of state or local law do not support claim to federal due process rights), citing
 
 Swarthout v. Cooke
 
 ,
 
 562 U.S. 216
 
 , 221-22,
 
 131 S.Ct. 859
 
 ,
 
 178 L.Ed.2d 732
 
 (2011).
 

 When a public employee has a property interest in his or her job, the constitutional requirements for predeprivation procedures are well-established: notice of the proposed deprivation, a statement of reasons, and an opportunity to be heard in response.
 
 Board of Regents v. Roth
 
 ,
 
 408 U.S. 564
 
 , 569-70,
 
 92 S.Ct. 2701
 
 ,
 
 33 L.Ed.2d 548
 
 (1972) ;
 
 Perry v. Sindermann
 
 ,
 
 408 U.S. 593
 
 , 602-03,
 
 92 S.Ct. 2694
 
 ,
 
 33 L.Ed.2d 570
 
 (1972). As for "the specific dictates of due process" in any individual case, we are required to consider "three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
 
 Mathews
 
 ,
 
 424 U.S. at 335
 
 ,
 
 96 S.Ct. 893
 
 . Being fired from a job does not require a predeprivation hearing that approximates a full trial. Cf.
 
 Goldberg v. Kelly
 
 ,
 
 397 U.S. 254
 
 , 266-71,
 
 90 S.Ct. 1011
 
 ,
 
 25 L.Ed.2d 287
 
 (1970) (termination of welfare benefits was such a substantial deprivation that plaintiff was entitled to a predeprivation "evidentiary hearing"). But a job is nonetheless a substantial enough property interest that, absent extenuating circumstances such as an emergency, the basics of predeprivation due process must be provided.
 

 Thus, in the normal course of terminating a public employee who has a property interest in his or her job, "the root requirement of the Due Process Clause" is the provision of adequate notice and "some kind of a hearing" to a public employee "
 
 before
 
 he is deprived of any significant property interest."
 
 Loudermill
 
 ,
 
 470 U.S. at 542, 546
 
 ,
 
 105 S.Ct. 1487
 
 (internal quotations omitted); accord, e.g.,
 
 Gilbert
 
 ,
 
 520 U.S. at 929
 
 ,
 
 117 S.Ct. 1807
 
 ;
 
 Zinermon
 
 ,
 
 494 U.S. at 132
 
 ,
 
 110 S.Ct. 975
 
 ("In situations where the State feasibly can provide a
 predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking.").
 

 To be clear, Bradley is not complaining about the adequacy of his notice or the procedural details of a hearing. All parties agree: he received no process at all. In contrast, plaintiffs in public employee due process cases often argue that their rights to due process were violated when state or local officials failed to comply with additional procedural details set forth in state statutes or local ordinances. State and local governments are free to provide more robust protections and detailed procedures for firing and disciplining public employees than is constitutionally required. Many have done so. Those detailed procedural codes are easier to administer than having to devise ad hoc procedures in each case.
 

 As we have written for decades, however, those additional procedural details in state and local law should not be confused with the minimal federal constitutional requirements of predeprivation notice and an opportunity to be heard. See, e.g.,
 
 Schultz v. Baumgart
 
 ,
 
 738 F.2d 231
 
 , 236 (7th Cir. 1984) (explaining that "it is not the task of this [federal] court to enforce in every procedural detail the elaborate requirements of [state law]"); accord, e.g.,
 
 Linear
 
 , 887 F.3d at 844 ("We regularly disparage arguments ... that procedures required by state law create property interests and hence lead to a federal requirement that state procedures be used."), citing
 
 Snowden v. Hughes
 
 ,
 
 321 U.S. 1
 
 , 11-13,
 
 64 S.Ct. 397
 
 ,
 
 88 L.Ed. 497
 
 (1944).
 
 [3]
 

 Furthermore, "[j]ust as a violation of state law does not a constitutional claim make, so the [state law] violation does not protect officials from the federal consequences of their otherwise-unconstitutional conduct," as Supreme Court precedent has "establish[ed] the indifference of constitutional norms to the content of state law."
 
 Archie
 
 , 847 F.2d at 1217 n.6, citing
 
 Home Telephone & Telegraph Co. v. City of Los Angeles
 
 ,
 
 227 U.S. 278
 
 ,
 
 33 S.Ct. 312
 
 ,
 
 57 L.Ed. 510
 
 (1913), and
 
 Snowden
 
 ,
 
 321 U.S. 1
 
 ,
 
 64 S.Ct. 397
 
 ,
 
 88 L.Ed. 497
 
 .
 

 This point has been clear since
 
 Monroe v. Pape
 
 ,
 
 365 U.S. 167
 
 , 183,
 
 81 S.Ct. 473
 
 ,
 
 5 L.Ed.2d 492
 
 (1961), which was overruled in part not relevant here by
 
 Monell
 
 ,
 
 436 U.S. at 664-89
 
 ,
 
 98 S.Ct. 2018
 
 .
 
 Monroe
 
 held that the defendant police officers were acting "under color of" state authority and could be held liable under § 1983 for violations of the United States "Constitution
 
 and laws of Illinois
 
 ," despite the existence of "a simple remedy" under Illinois law and the fact that "the courts of Illinois are available to give petitioners
 that full redress."
 
 365 U.S. at 172
 
 ,
 
 81 S.Ct. 473
 
 (emphasis added). This was so because § 1983 was designed to provide a remedy "against those who representing a State in some capacity were
 
 unable
 
 or
 
 unwilling
 
 to enforce a state law."
 

 Id.
 

 at 176
 
 ,
 
 81 S.Ct. 473
 
 .
 
 Monroe
 
 explained: "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court."
 

 Id.
 

 at 183
 
 ,
 
 81 S.Ct. 473
 
 .
 

 In sum, the simultaneous violation of both federal and state law does not provide defendants with a defense to liability, nor does the existence of a state remedy bar aggrieved plaintiffs from pursuing federal claims.
 

 B.
 
 Monell Basics
 

 The legal issues are undisputed until this point: Bradley had a protected property interest, which he lost without any due process. And since
 
 Monell v. New York City Dep't of Social Services
 
 ,
 
 436 U.S. 658
 
 , 694,
 
 98 S.Ct. 2018
 
 ,
 
 56 L.Ed.2d 611
 
 (1978), a municipal corporation may be held liable under § 1983 in such circumstances. As we recently explained, "[t]he critical question under
 
 Monell
 
 , reaffirmed in
 
 Los Angeles County v. Humphries
 
 ,
 
 562 U.S. 29
 
 ,
 
 131 S.Ct. 447
 
 ,
 
 178 L.Ed.2d 460
 
 (2010), is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents."
 
 Glisson v. Indiana Dep't of Corrections
 
 ,
 
 849 F.3d 372
 
 , 379 (7th Cir. 2017) (en banc). Determining what caused the violation is crucial because
 
 Monell
 
 held that "municipalities are not liable for the torts of their employees under the strict-liability doctrine of respondeat superior, as private employers are."
 
 Vodak v. City of Chicago
 
 ,
 
 639 F.3d 738
 
 , 747 (7th Cir. 2011). Local governments are liable for damages under § 1983 only for violations of federal rights that occur "pursuant to official municipal policy of some nature."
 
 Monell
 
 ,
 
 436 U.S. at 691
 
 ,
 
 98 S.Ct. 2018
 
 .
 

 The "official policy" requirement for
 
 Monell
 
 claims is "intended to distinguish acts of the
 
 municipality
 
 from acts of
 
 employees
 
 of the municipality" and to limit liability to "action for which the municipality is actually responsible."
 
 Pembaur v. City of Cincinnati
 
 ,
 
 475 U.S. 469
 
 , 479-80,
 
 106 S.Ct. 1292
 
 ,
 
 89 L.Ed.2d 452
 
 (1986). A plaintiff might prove this essential element by showing that (1) "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers,"
 
 Monell
 
 ,
 
 436 U.S. at 690
 
 ,
 
 98 S.Ct. 2018
 
 ; or (2) the "constitutional deprivations [were] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels,"
 

 id.
 

 at 690-91
 
 ,
 
 98 S.Ct. 2018
 
 ; or (3) the deprivation was "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,"
 

 id.
 

 at 694
 
 ,
 
 98 S.Ct. 2018
 
 . See also
 
 Los Angeles County v. Humphries
 
 , 562 U.S. at 36,
 
 131 S.Ct. 447
 
 ;
 
 Board of County Com'rs of Bryan County v. Brown
 
 ,
 
 520 U.S. 397
 
 , 403-04,
 
 117 S.Ct. 1382
 
 ,
 
 137 L.Ed.2d 626
 
 (1997).
 

 The
 
 Monell
 
 requirement can be satisfied by "a single decision attributable to a municipality."
 
 Bryan County
 
 , 520 U.S. at 405,
 
 117 S.Ct. 1382
 
 . "[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers" to adopt "a course of action tailored to a particular situation ... whether that action
 is to be taken only once or to be taken repeatedly."
 
 Pembaur
 
 ,
 
 475 U.S. at 480-81, 485
 
 ,
 
 106 S.Ct. 1292
 
 (municipality was liable under § 1983 when county prosecutor acting as county's final decisionmaker directed subordinates to engage in actions that violated plaintiff's rights);
 
 City of Newport v. Fact Concerts, Inc.
 
 ,
 
 453 U.S. 247
 
 , 252,268,
 
 101 S.Ct. 2748
 
 ,
 
 69 L.Ed.2d 616
 
 (1981) (municipal liability for compensatory-but not punitive-damages was appropriate under § 1983 when city council canceled performer's concert license without due process).
 

 Contrary to defendants' position here, such an unconstitutional act of municipal decisionmakers can result in municipal liability even if their act also violated state law. For example, in
 
 Owen v. City of Independence
 
 ,
 
 445 U.S. 622
 
 ,
 
 100 S.Ct. 1398
 
 ,
 
 63 L.Ed.2d 673
 
 (1980), the Supreme Court made clear that both a city and its manager could be held liable under § 1983 for firing the city police chief without due process, even if the defendants' actions also violated state law.
 
 Id
 
 . at 627 n.4 & 633,
 
 100 S.Ct. 1398
 
 (holding qualified immunity does not apply to damage claims against municipal government itself).
 

 If a plaintiff cannot prove, however, that a policy is attributable to the municipality itself-i.e., that the deprivation was due to "[e]ither the content of an official policy, a decision by a final decisionmaker, or evidence of custom"-then there is no municipal liability.
 
 Glisson
 
 ,
 
 849 F.3d at 379
 
 . Any inquiry into whether the actions of a municipal employee may be attributed to the municipality can be answered by applying the
 
 Monell
 
 test for liability.
 

 In Bradley's case, this component is also undisputed. The mayor and the board concede that they had sole discretion and authority to fire Bradley. "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably."
 
 Bryan
 

 County
 
 , 520 U.S. at 405,
 
 117 S.Ct. 1382
 
 . Under
 
 Monell
 
 , the actions of the mayor and village board in firing Bradley are, by virtue of the defendants' authority as policymakers, automatically considered actions of the municipality itself under § 1983. Their decision to deprive Bradley of due process is the municipal policy that forms the basis for defendants' liability.
 

 III.
 
 Defendants' Counter-argument
 

 A busy reader might be forgiven for thinking that this opinion should end here. The municipal defendants seem to have conceded that the municipality's policymakers unconstitutionally deprived Bradley of a recognized property interest without any due process. Yet defendants instead contend that their official action-taken by the village's highest-ranking officials with final policymaking authority-should be considered "random and unauthorized" and thus excused under
 
 Parratt
 
 . We reject this defense.
 

 To explain why, we first describe
 
 Parratt
 
 and its progeny (
 
 Hudson
 
 ,
 
 Logan
 
 ,
 
 Zinermon
 
 , and our circuit's application of the
 
 Parratt
 
 exception in
 
 Easter House
 
 ). We then explain why defendants' proposal to extend the
 
 Parratt
 
 exception to municipal § 1983 liability is contrary to our own and other circuits' precedent-and for good reasons. It makes no sense to speak of such official policymaking as "random and unauthorized" in terms of
 
 Parratt
 
 . That's why the Supreme Court has never suggested that
 
 Parratt
 
 can be extended to defend against an otherwise valid
 
 Monell
 
 claim. The defendants' proposed exception is not necessary given
 
 Monell
 
 's test for liability. And accepting defendants' argument would conflict directly with
 
 Monroe
 
 ,
 
 Monell
 
 ,
 
 Pembaur
 
 ,
 
 Owen
 
 , and
 
 Bryan County
 
 . We would have to reach the improbable conclusion that a municipality is
 
 not
 
 liable for its highest officials' decision to deprive a person of his federal constitutional rights.
 

 Finally, even if the
 
 Parratt
 
 exception were relevant here, neither Supreme Court precedent nor our decision in
 
 Easter House
 
 supports defendants' theory that, so long as municipal policymakers violate both the federal Constitution and state law, and some state remedy exists, the municipality is excused from § 1983 liability. In the past we have disparaged similar attempts to evade municipal liability, dismissing as "extravagant" a claim that the "acts of [a] Mayor ... are merely acts of an errant employee."
 
 Vodak
 
 ,
 
 639 F.3d at 747
 
 . Defendants' proposal would also undermine (1) the constitutional protection for public employees in
 
 Roth
 
 ,
 
 Sindermann
 
 , and
 
 Loudermill
 
 , while creating a direct conflict with (2) the
 
 Monroe v. Pape
 
 line of cases recognizing that state or local officials may be liable under § 1983 for actions taken "under color of state law," even if the official's actions also violate state or local law, as well as (3)
 
 Patsy v. Board of Regents
 
 ' holding that § 1983 plaintiffs need not exhaust state-law remedies before asserting their federal rights. We see no reason to avoid Supreme Court precedent or to read our precedent in such a disruptive manner.
 

 A.
 
 Parratt and State Employees' "Random and Unauthorized" Actions
 

 1.
 
 Supreme Court Precedent
 

 "
 
 Parratt
 
 is a rare exception to due process norms."
 
 Brunson v. Murray
 
 ,
 
 843 F.3d 698
 
 , 715 n.9 (7th Cir. 2016). A close look at the facts and holdings of
 
 Parratt
 
 and its progeny demonstrates the narrow, pragmatic reasoning underlying this exception to § 1983 due process liability.
 

 In
 
 Parratt
 
 , a state prisoner ordered the famous "hobby materials valued at $23.50."
 
 451 U.S. at 529
 
 ,
 
 101 S.Ct. 1908
 
 . Due to the actions of state prison guards, the hobby materials were lost before they reached the prisoner. He sued under
 
 42 U.S.C. § 1983
 
 to recover their value as damages for depriving him of property without due process of law. In that situation, it would have been impossible for the state to provide a predeprivation hearing. The initial deprivation-the property loss-was as a practical matter "beyond the control of the State."
 

 Id.
 

 at 541
 
 ,
 
 101 S.Ct. 1908
 
 .
 
 Parratt
 
 is thus based on the following narrow grounds: If a predeprivation hearing "is not only impracticable, but impossible," and yet "some meaningful opportunity subsequent to the initial taking" is available to provide redress, then that is all the due process the state can be expected to provide, and the aggrieved person's constitutional rights have not been violated.
 

 Id.
 

 at 541-43
 
 ,
 
 101 S.Ct. 1908
 
 .
 

 In later cases, the Supreme Court elaborated on
 
 Parratt
 
 's limits. The Court emphasized that "absent 'the necessity of quick action by the State or the impracticality of providing any predeprivation process,' a postdeprivation hearing [ ] would be constitutionally inadequate," which "is particularly true where ... the State's only post-termination process comes in the form of an independent tort action."
 
 Logan v. Zimmerman Brush Co.
 
 ,
 
 455 U.S. 422
 
 , 436,
 
 102 S.Ct. 1148
 
 ,
 
 71 L.Ed.2d 265
 
 (1982), quoting
 
 Parratt
 
 ,
 
 451 U.S. at 539
 
 ,
 
 101 S.Ct. 1908
 
 . If the state lacks the opportunity to provide any predeprivation process (e.g., due to an emergency or the actions of a rogue employee), the state can still meet its constitutional due process obligations by providing adequate postdeprivation procedures because the "state's action is not complete until and unless it provides or
 refuses to provide a suitable postdeprivation remedy."
 
 Hudson
 
 ,
 
 468 U.S. at 533
 
 ,
 
 104 S.Ct. 3194
 
 (extending
 
 Parratt
 
 to intentional but random and unauthorized deprivations of prisoners' property). In essence, "[t]he controlling inquiry is solely whether the state is in a position to provide for predeprivation process;" if "the property deprivation is effected pursuant to an established state procedure,"
 
 Parratt
 
 is irrelevant.
 

 Id.
 

 at 534
 
 ,
 
 104 S.Ct. 3194
 
 .
 

 Parratt
 
 generated disagreement among circuit courts of appeals, and the Supreme Court stepped in to clarify the scope and rationale of
 
 Parratt
 
 (and
 
 Hudson
 
 ) in the context of Florida's civil commitment process for people with serious mental illness in
 
 Zinermon v. Burch
 
 ,
 
 494 U.S. 113
 
 , 116 & n.2,
 
 110 S.Ct. 975
 
 ,
 
 108 L.Ed.2d 100
 
 (1990). The
 
 Zinermon
 
 plaintiff alleged that he had been committed to a state mental hospital as a voluntary admittee even though his condition should have prompted assessment under the state's more elaborate procedures for involuntary commitment.
 

 Id.
 

 at 115, 122-23
 
 ,
 
 110 S.Ct. 975
 
 .
 

 The plaintiff made clear that he was "not attacking the facial validity of Florida's voluntary admission procedures any more than he is attacking the facial validity of Florida's involuntary admission procedures."
 
 494 U.S. at
 
 117 n.3,
 
 110 S.Ct. 975
 
 . In fact, he conceded "that, if Florida's statutes were strictly complied with, no deprivation of liberty without due process would occur."
 

 Id.
 

 Furthermore, the plaintiff did "not dispute that he had remedies under Florida law for unlawful confinement," including damage remedies under state mental health statutes and recourse to the state's common-law tort of false imprisonment.
 

 Id.
 

 at 130 n.15,
 
 110 S.Ct. 975
 
 .
 

 The defendants, who were state hospital officials, argued that
 
 Parratt
 
 and
 
 Hudson
 
 should excuse them from § 1983 liability. The plaintiff was alleging at most "only a random, unauthorized violation of the Florida statutes governing admission of mental patients," they argued, and he thus should be limited to "the postdeprivation remedies provided by Florida's statutory and common law."
 

 Id.
 

 at 115, 130
 
 ,
 
 110 S.Ct. 975
 
 .
 

 The Supreme Court rejected that argument. The Court first acknowledged that the state
 
 could
 
 have imposed additional safeguards at a predictable juncture in the hospital admission process-i.e., upon admission.
 
 494 U.S. at 135
 
 ,
 
 110 S.Ct. 975
 
 . But the Court also noted the evidence that the hospital staff had disregarded existing procedures in determining whether plaintiff was competent to be admitted voluntarily, noting the psychiatrist's admission notes on petitioner's confused mental state.
 

 Id.
 

 at 134, 118
 
 ,
 
 110 S.Ct. 975
 
 (after plaintiff was found wandering on a highway "bruised and bloodied," hospital staff gave him
 
 voluntary
 
 admission forms to sign while he "was hallucinating, confused, and psychotic and believed he was 'in heaven' "). The staff "knew or should have known that he was incapable of informed consent," and the way in which he was admitted "certainly did not ensure compliance with the statutory standard for voluntary admission."
 

 Id.
 

 at 134
 
 ,
 
 110 S.Ct. 975
 
 ; see also
 

 id.
 

 at 135
 
 ,
 
 110 S.Ct. 975
 
 ("The [hospital] staff are the
 
 only
 
 persons in a position to take notice of any misuse of the voluntary admission process and to ensure that the proper procedure is followed."). Thus, the additional guidance the Court apparently envisioned Florida providing was: do not direct incompetent patients to sign the voluntary admission forms for competent patients. That would have come close to "a rule forbidding a prison guard to maliciously destroy a prisoner's property," which would have seemed futile.
 

 Id.
 

 at 137
 
 ,
 
 110 S.Ct. 975
 
 .
 

 Zinermon
 
 took care to distinguish
 
 Parratt
 
 and
 
 Hudson
 
 :
 

 [P]etitioners cannot characterize their conduct as 'unauthorized' in the sense the term is used in
 
 Parratt
 
 and
 
 Hudson
 
 . The State delegated to them the power and authority to effect the very deprivation complained of here, Burch's confinement in a mental hospital,
 
 and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement
 
 . In
 
 Parratt
 
 and
 
 Hudson
 
 , the state employees had no similar broad authority to deprive prisoners of their personal property, and no similar duty to initiate (for persons unable to protect their own interests) the procedural safeguards required before deprivations occur. The deprivation here is 'unauthorized' only in the sense that it was not an act sanctioned by state law, but, instead, was a 'depriv[ation] of constitutional rights ... by an official's abuse of his position.'
 
 Monroe
 
 [
 
 v. Pape
 
 ,
 
 365 U.S. 167
 
 , 172,
 
 81 S.Ct. 473
 
 ,
 
 5 L.Ed.2d 492
 
 (1961) ].
 

 494 U.S. at 138
 
 ,
 
 110 S.Ct. 975
 
 (emphasis added). The Court's citation to
 
 Monroe v. Pape
 
 confirmed that a defendant's admissions that he had violated state law and that state law provides a postdeprivation remedy, as defendants admit here, are not by themselves a defense to the federal constitutional claim. And the quoted passage from
 
 Zinermon
 
 maps exactly onto the facts of this case: Illinois law "delegated to [defendants] the power and authority to effect the very deprivation complained of here, [Burch's confinement or Bradley's termination], and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful [confinement or termination]."
 
 Id
 
 . at 138,
 
 110 S.Ct. 975
 
 .
 

 This point was hammered home further by the Court's explicit rejection of the village's position here. The Court reiterated that
 
 Parratt
 
 and
 
 Hudson
 
 "do not stand for the proposition that in every case where a deprivation is caused by an 'unauthorized ... departure from established practices,' state officials can escape § 1983 liability simply because the State provides tort remedies."
 
 494 U.S. at
 
 138 n.20,
 
 110 S.Ct. 975
 
 . Such a "reading of
 
 Parratt
 
 and
 
 Hudson
 
 detaches those cases from their proper role as special applications of the settled principles expressed in
 
 Monroe
 
 [
 
 v. Pape
 
 ] and
 
 Mathews
 
 [
 
 v. Eldridge
 
 ]."
 

 Id.
 

 Zinermon
 
 insisted that
 
 Parratt
 
 and
 
 Hudson
 
 remained tethered to a long line of § 1983 jurisprudence, emphasizing that those cases merely "represent a special case of the general
 
 Mathews v. Eldridge
 
 analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide."
 
 494 U.S. at 128
 
 ,
 
 110 S.Ct. 975
 
 . In fact, the Court continued, "
 
 Parratt
 
 is not an exception to the
 
 Mathews
 
 balancing test, but rather an application of that test to the unusual case in which one of the variables in the
 
 Mathews
 
 equation-the value of predeprivation safeguards-is negligible in preventing the kind of deprivation at issue."
 

 Id.
 

 at 129
 
 ,
 
 110 S.Ct. 975
 
 . This consideration swamped the other
 
 Mathews
 
 factors in
 
 Parratt
 
 itself because "no matter how significant the private interest at stake and the risk of its erroneous deprivation, see
 
 Mathews
 
 ,
 
 424 U.S. at 335
 
 ,
 
 96 S.Ct. 893
 
 , the State cannot be required constitutionally to do the impossible by providing predeprivation process."
 

 Id.
 

 Thus,
 
 Zinermon
 
 made clear that
 
 Parratt
 
 and
 
 Hudson
 
 had not broadly repudiated existing § 1983 law.
 

 2.
 
 Seventh Circuit Application of Parratt in Easter House
 

 Shortly after
 
 Zinermon
 
 was decided, we considered these questions in a case the
 Supreme Court had remanded for further consideration in light of
 
 Zinermon
 
 .
 
 Easter House v. Felder
 
 ,
 
 910 F.2d 1387
 
 (7th Cir. 1990) (en banc). It would be difficult to overstate how unusual the facts were in
 
 Easter House
 
 , or how much they differed from mainstream public employee due process cases like Bradley's. Plaintiff Easter House was a private adoption agency that had been betrayed by a former director named Smith. Stung by some management decisions, Smith abruptly quit Easter House to start a competing adoption agency that she also named Easter House (for clarity's sake, both we and the
 
 Easter House
 
 opinion refer to the imitator agency as "Easter House II").
 

 Id.
 

 at 1391 & n.4, 1393 & n.7. She stole Easter House's open and closed case files on adoptive families and children. She also induced Easter House's only other trained social worker to join Easter House II, attempted to divert Easter House's mail and telephone calls to her new address, and deceived a family in the middle of the adoption process to deal with and pay her rather than Easter House.
 

 Id.
 

 at 1391
 
 , 1393 & nn.7-9.
 

 The constitutional claims stem from the fact that Smith also roped into her scheme some state licensing officials in the Illinois Department of Children and Family Services (DCFS). She told them that Easter House was careless in handling confidential adoption records and would solicit affluent former clients to increase the number of placements. She also "made vague allegations that Easter House was connected to foreign adoption agencies" and expected to "make a million" from those connections.
 
 910 F.2d at
 
 1391 & n.3. Although Easter House never lost its license and continued operating throughout this debacle, DCFS officials acted contrary to state licensing procedures and: (a) delayed Easter House's license renewal, (b) sent Easter House a letter with some inaccurate licensing information that was corrected shortly thereafter, (c) incorrectly told three people that Easter House's license had lapsed, and (d) did not offer Easter House assistance in the license renewal process "as required by the DCFS's regulations and enforcement manual."
 

 Id.
 

 at 1391-92
 
 .
 

 At trial, a jury found that the defendant state officials had conspired with Smith to deprive Easter House of its state-issued license and had spread false information about it.
 
 910 F.2d at 1390-94
 
 . The jury awarded damages on Easter House's federal claim that the defendants temporarily deprived it of property-its interest in the prompt renewal of its license-without due process of law. We were "not wholly convinced" this property interest was "of constitutional magnitude," given the fact that Easter House was able to operate without interruption, but we elected to "assume" this "difficult question" was answered in the affirmative.
 

 Id.
 

 at 1395-96
 
 .
 

 We reversed the judgment in favor of Easter House, finding that the due process claim was barred by
 
 Parratt
 
 . To the extent the state defendants conspired with Smith (and we found that much of the evidence seemed to indicate their "lack of active participation,"
 
 910 F.2d at
 
 1393 n.7 ), we held that the state employees' actions to undermine the state's licensing scheme to assist a competitor were "random and unauthorized" and that the state's due process obligations could be met by existing state-law tort remedies after the fact.
 

 Id.
 

 at 1404-05
 
 .
 

 The en banc majority grappled with the tension between the
 
 Parratt
 
 -
 
 Hudson
 
 exception and
 
 Zinermon
 
 . Our circuit precedent had previously acknowledged that
 
 Parratt
 
 could be read more narrowly to focus on the fact that "the officials authorized to grant such a hearing are unaware of the deprivation before it occurs," or
 could be read more broadly to "place[ ] beyond the reach of section 1983 any loss that 'is not a result of some established state procedure' ... [because] the state cannot predict when a loss will occur."
 
 Matthiessen v. Board of Education
 
 ,
 
 857 F.2d 404
 
 , 407 n.3 (7th Cir. 1988) (holding that
 
 Parratt
 
 did not apply to municipal liability analysis under
 
 Monell
 
 ), quoting
 
 Tavarez v. O'Malley
 
 ,
 
 826 F.2d 671
 
 , 677 (7th Cir. 1987), and
 
 Wilson v. Town of Clayton
 
 ,
 
 839 F.2d 375
 
 , 380 (7th Cir. 1988). We recognized in
 
 Easter House
 
 that the Supreme Court's rejection of the
 
 Parratt
 
 defense in
 
 Zinermon
 
 "hints that a 'narrow' application of the
 
 Parratt
 
 rule may be the appropriate course," and we tried to ascertain what that meant for Easter House.
 
 910 F.2d at 1400
 
 , citing
 
 Matthiessen
 
 ,
 
 857 F.2d 404
 
 ,
 
 Wilson
 
 ,
 
 839 F.2d 375
 
 , and
 
 Tavarez
 
 ,
 
 826 F.2d 671
 
 .
 

 Easter House
 
 saw the primary distinctions between
 
 Parratt
 
 and
 
 Zinermon
 
 as: (1) the
 
 Zinermon
 
 state hospital defendants had both the authority and duty to initiate predeprivation safeguards, while the
 
 Parratt
 
 state prison defendants had neither; and (2) although predeprivation process was impossible in
 
 Parratt
 
 , in
 
 Zinermon
 
 the state could have required additional procedures to determine if the existing predeprivation hospital admission procedure should be used.
 
 910 F.2d at 1400-02
 
 . To apply this teaching in
 
 Easter House
 
 , we noted that, unlike the
 
 Zinermon
 
 defendants, the "DCFS officials did not have the duty to initiate [formal hearing] predeprivation safeguards," but "[r]ather, the responsibility to initiate the procedural safeguards rested with the party aggrieved by the preliminary DCFS decision-in this case Easter House."
 

 Id.
 

 at 1402
 
 . In addition, the appropriate lens for deciding state responsibility under § 1983 was whether "the state knew or should have known" about the defendants' disregard of state law and procedure.
 

 Id.
 

 at 1401
 
 . Given that "Easter House point[ed] to nothing which would indicate that the state knew or should have known" that DCFS officials might engage in a conspiracy to give Easter House some incorrect advice and delay the renewal of their license in contravention of state procedure, § 1983 liability was inappropriate.
 

 Id.
 

 at 1401
 
 .
 

 Also, the
 
 Easter House
 
 opinion did not even cite
 
 Monell
 
 , and we rejected Easter House's attempt to impose a
 
 Monell
 
 -like framework for determining state liability, declining to adopt Easter House's proposed test that "the single act of a sufficiently high-ranking policy-maker may equate with or be deemed established state procedure."
 
 910 F.2d at 1402
 
 . To the contrary, "we [did] not believe that
 
 Zinermon
 
 create[d] a
 
 per se
 
 'employee status' exception to
 
 Parratt
 
 ."
 

 Id.
 

 at 1400
 
 . To be sure, "whether a state official ranks 'high' or 'low' in the state hierarchy" would be "relevant as indicia of the discretion which that official exercises."
 

 Id.
 

 ; see also
 

 id.
 

 at 1402
 
 ("Without a doubt, the employee's position in the governmental hierarchy is relevant to this inquiry."). But in determining whether a state official is liable for a constitutional violation,
 
 Easter House
 
 directs us to look to whether (1) "a state's policy and procedures in a given area are delegated to a specified policymaker, be it a single person, a committee, or the state legislature," in which case that entity's "pronouncement in a given case reflects the state's position," even if informally made; or (2) if the state's policy could be said to have "change[d] if the policymaker repeatedly deviates from established policy and procedure until his practice and custom has replaced the formal policy and procedures."
 

 Id.
 

 at 1403
 
 . This liability analysis is at odds with the liability analysis required by
 
 Monell
 
 in cases against municipalities. But we can easily read
 
 Easter House
 
 as not creating a conflict
 with
 
 Monell
 
 because
 
 Easter House
 
 dealt with state officials, not local governments. We simply did not address in
 
 Easter House
 
 any question of municipal liability under
 
 Monell
 
 .
 
 [4]
 

 Applying this analysis to Easter House's claim, we noted that it was the state that "promulgated policy and procedure by formal means," rendering "the employment status of the state employee violating that procedure ... much less important in determining whether a deviation from the policy may be characterized as random and unauthorized under
 
 Parratt
 
 ."
 
 910 F.2d at 1403
 
 . Thus, "[e]ven if we assume that the [DCFS defendants] qualify as 'policymakers' themselves-which we doubt given their position in the governmental hierarchy-their 'policy', which at absolute best may be characterized as informal, cannot be said automatically to preempt or displace otherwise adequate existing state policy and procedure."
 

 Id.
 

 In the end, Judge Easterbrook's concurrence in
 
 Easter House
 
 accurately described our efforts to reconcile the tension between
 
 Parratt
 
 and
 
 Zinermon
 
 and showed how narrow the majority opinion had to be to thread its way between "a line of precedent already resembling the path of a drunken sailor."
 
 910 F.2d at 1408-10
 
 . The majority read
 
 Parratt
 
 and
 
 Hudson
 
 as cautioning against "the use of § 1983 as just another opportunity for parties to shop between state and federal forums."
 

 Id.
 

 at 1404
 
 . And we concluded the discussion of
 
 Parratt
 
 and
 
 Zinermon
 
 this way:
 

 Section 1983 must be preserved to remedy only those deprivations which actually occur without adequate due process of law, such as those which result from a
 
 state's
 
 conscious decision to ignore the protections guaranteed by the Constitution. It should not be employed to remedy deprivations which occur at the hands of a state employee who is acting in direct contravention of the state's established policies and procedures which have been designed to guarantee the very protections which the
 
 employee
 
 now has chosen to ignore. Such a limitation upon § 1983 maintains the delicate balance between the state and federal judicial systems, leaving the former to remedy individual torts and the latter to address property deprivations which occur without adequate due process protection.
 

 Id.
 

 at 1404-05
 
 .
 

 Moving forward from
 
 Easter House
 
 , it is important to acknowledge what
 
 Easter House
 
 did not do. It did not address
 
 Monroe v. Pape
 
 's holding that a state official acts under color of state law for purposes of § 1983 even if he violates state law. It also did not address
 
 Loudermill
 
 or
 
 Roth
 
 or the due process rights of public employees who have property interests in their jobs. The
 
 Easter House
 
 majority did not even mention
 
 Monell
 
 or the major differences under § 1983 between state and local governments. In addition, as explained further below, we and other circuits have squarely rejected efforts to apply
 
 Parratt
 
 to
 
 Monell
 
 claims.
 
 Easter House
 
 did not criticize, let alone overrule, the line of our cases rejecting
 
 Parratt
 
 defenses to due process claims against municipal policymakers, such as
 
 Matthiessen
 
 ,
 
 Wilson
 
 , and
 
 Tavarez
 
 .
 
 [5]
 

 B.
 
 The Gap Between
 

 Monell
 

 and
 

 Parratt
 

 The village contends that Bradley's firing without notice or opportunity to be heard presents a "single act of employee misconduct" that cannot "automatically become[ ] the state's new position" and lead to liability because the State of Illinois has not authorized the action. See
 
 Easter House
 
 ,
 
 910 F.2d at
 
 1402 ; Appellees' Br. at 22, citing
 
 Clifton v. Schafer
 
 ,
 
 969 F.2d 278
 
 , 281-82 (7th Cir. 1992). This argument focused on
 
 state
 
 policy might have more force (apart from its conflict with canonical § 1983 precedent such as
 
 Monroe v. Pape
 
 ) if the State of Illinois were somehow a defendant here, or perhaps if a village department had been acting as the State's agent in administering a state benefits program (the issue in
 
 Clifton
 
 ). But for the last four decades, different rules of liability under § 1983 apply to municipalities making and carrying out their own policies.
 

 The Supreme Court has never suggested that
 
 Parratt
 
 could apply to a
 
 Monell
 
 claim. The test for liability under
 
 Monell
 
 is already designed to identify conduct that is attributable to the municipality itself-which includes actions taken by an official with policymaking authority. There is no need to impose a separate inquiry as to whether a municipal policymaker's conduct is "random and unauthorized."
 
 Parratt
 
 ,
 
 Hudson
 
 , and
 
 Zinermon
 
 were all decided after
 
 Monell
 
 , and they either did not cite
 
 Monell
 
 at all or merely noted that it overruled the portion of
 
 Monroe v. Pape
 
 rejecting any form of municipal liability under § 1983.
 
 Parratt
 
 and its progeny also did not cite any of the Supreme Court cases holding that a single act of a municipality or one of its high-ranking or policy-making officials can be sufficient for § 1983 liability under
 
 Monell
 
 , including
 
 Owen v. City of Independence
 
 ,
 
 445 U.S. 622
 
 , 627 & n.4,
 
 100 S.Ct. 1398
 
 ,
 
 63 L.Ed.2d 673
 
 (1979) ( § 1983 liability appropriate for municipality that fired police chief without due process, despite fact that it was also violating state law),
 
 City of Newport v. Fact Concerts
 
 ,
 
 453 U.S. 247
 
 ,
 
 101 S.Ct. 2748
 
 ,
 
 69 L.Ed.2d 616
 
 (1981) (decided weeks apart from
 
 Parratt
 
 ), or
 
 Pembaur v. City of Cincinnati
 
 ,
 
 475 U.S. 469
 
 ,
 
 106 S.Ct. 1292
 
 ,
 
 89 L.Ed.2d 452
 
 (1986) (decided four years before
 
 Zinermon
 
 ).
 

 Conversely, the Supreme Court's
 
 Monell
 
 line of jurisprudence, including
 
 Bryan County
 
 and
 
 Pembaur,
 
 has never even suggested importing the
 
 Parratt
 
 framework, despite facts often showing concurrent violations of state law and available state remedies. Because it does not make sense to treat a municipal policymaker's actions as "random and unauthorized," and absent any indication from the Supreme Court that
 
 Parratt
 
 and its progeny were intended to upend the
 
 Monell
 
 framework, we have flatly rejected efforts to apply
 
 Parratt
 
 defenses to
 
 Monell
 
 claims. In
 
 Wilson v. Town of Clayton
 
 , the plaintiff alleged, among other claims, that the governing town board deprived him of property without due process of law by acting to shut down his business through a campaign of harassment.
 
 839 F.2d at 377-78
 
 . The district court had dismissed the claim by applying a broad reading of
 
 Parratt
 
 and left the plaintiff to his tort remedies under state law. We reversed, making clear that actions of municipal policymakers simply cannot be treated as "random and unauthorized" under
 
 Parratt
 
 :
 

 Because a municipality may only be liable for "acts which the municipality has officially sanctioned or ordered,"
 
 Pembaur v. City of Cincinnati
 
 ,
 
 475 U.S. 469
 
 [,480],
 
 106 S.Ct. 1292
 
 ,
 
 89 L.Ed.2d 452
 
 (1986), its liability can never be premised on the result of a random and unauthorized act. The district court's dismissal of [the plaintiff]'s claim against the Town on the basis of
 
 Parratt
 
 misses the point of
 
 Parratt
 
 . "In
 
 Parratt
 
 , the Court emphasized that it was dealing with 'a tortious loss of ... property as a result of a random and unauthorized act by a state employee ... not a result of some established state procedure.' "
 
 Logan v. Zimmerman Brush Co.
 
 ,
 
 455 U.S. 422
 
 , 435-36,
 
 102 S.Ct. 1148
 
 ,
 
 71 L.Ed.2d 265
 
 (1982) (quoting
 
 Parratt
 
 ,
 
 451 U.S. at 541
 
 ,
 
 101 S.Ct. 1908
 
 ). When it is the Town itself that is being sued, and the suit is allowed under
 
 Monell
 
 because the action was executed in accordance with "official policy," the tortious loss of property can never be the result of a random and unauthorized act.
 
 Therefore, a complaint asserting municipal liability under
 

 Monell
 

 by definition states a claim to which
 

 Parratt
 

 is inapposite.
 

 Id.
 
 at 380 (emphasis added).
 

 Other circuits have agreed with this line of our cases. For example, in
 
 Woodard v. Andrus
 
 ,
 
 419 F.3d 348
 
 , 351-53 (5th Cir. 2005), the district court dismissed a claim against a municipal court's County Clerk who had charged fees in excess of those permitted by state law, reasoning that under
 
 Parratt
 
 the clerk's actions were "random and unauthorized" and plaintiff had recourse to adequate state remedies. The Fifth Circuit reversed, holding that the defendant was the municipality's ultimate repository of county power for assessing court fees, so that
 
 Monell
 
 permitted municipal liability for the "official policy" embodied by the clerk's actions.
 

 Id.
 

 at 352-53
 
 . In short, "the
 
 Parratt
 

 /
 

 Hudson
 
 doctrine is inapposite" because "actions in accordance with an 'official policy' under
 
 Monell
 
 can hardly be labeled 'random and unauthorized.' "
 
 Id
 
 . at 353, quoting
 
 Brooks v. George County
 
 ,
 
 84 F.3d 157
 
 , 165 (5th Cir. 1996) (affirming liability for plaintiff and rejecting
 
 Parratt
 
 defense to due process claim: "Where a municipal officer operates
 
 pursuant to a local custom or procedure
 
 , the
 
 Parratt
 

 /
 

 Hudson
 
 doctrine is inapposite").
 

 Similarly, in
 
 Pangburn v. Culbertson
 
 ,
 
 200 F.3d 65
 
 (2d Cir. 1999), the Second Circuit held that if an "alleged loss results from adherence to an established state or municipal policy," which for municipal liability can include the act of "even 'a single decision' by an official with final policymaking authority," quoting
 
 Pembaur
 
 ,
 
 475 U.S. at 480
 
 ,
 
 106 S.Ct. 1292
 
 , then "the availability of post-deprivation remedies does not defeat a Section 1983 claim."
 
 Pangburn
 
 cited
 
 Sullivan v. Town of Salem
 
 ,
 
 805 F.2d 81
 
 , 86 (2d Cir. 1986), which reversed a
 
 Parratt
 
 dismissal of a
 
 Monell
 
 due process claim: "If the conduct of the building official either established or was pursuant to town policy,
 
 Parratt
 
 and its progeny, which apply only to random, unauthorized conduct, are simply inapposite to this case." Accord,
 
 Sanders v. Kennedy
 
 ,
 
 794 F.2d 478
 
 , 482 (9th Cir. 1986) (reversing
 
 Parratt
 
 dismissal where plaintiffs alleged
 
 Monell
 
 due process claim based on local government's official policy, practice, or custom, and the "availability of a state tort remedy" was irrelevant);
 
 McKee v. Heggy
 
 ,
 
 703 F.2d 479
 
 , 482-83 & n. 6 (10th Cir. 1983) (reversing dismissal of
 
 Monell
 
 due process claim where local officials auctioned plaintiff's car without complying with state forfeiture laws and possibly pursuant to city police custom, and explaining "an act by state officials need not comport with state law to be a deprivation of due process,
 
 Home Telephone
 
 , [
 
 227 U.S. 278
 
 ,
 
 33 S.Ct. 312
 
 ,
 
 57 L.Ed. 510
 
 ], or to be actionable under § 1983,
 
 Monroe
 
 [,
 
 365 U.S. 167
 
 ,
 
 81 S.Ct. 473
 
 ,
 
 5 L.Ed.2d 492
 
 ]" and "the availability of a state post deprivation remedy does not provide [plaintiff] with due process"); see also
 
 Gonzales v. City of Castle Rock
 
 ,
 
 366 F.3d 1093
 
 , 1113-14 (10th Cir. 2004) (en banc) ("when the issue is a deprivation resulting from a municipal policy ... neither the city nor individual officers can seek refuge under
 
 Parratt
 
 "), rev'd on other grounds,
 
 545 U.S. 748
 
 ,
 
 125 S.Ct. 2796
 
 ,
 
 162 L.Ed.2d 658
 
 (2005).
 

 So too here. The actions of the defendants as municipal policymakers simply cannot be deemed "random and unauthorized" within the meaning of
 
 Parratt
 
 . Their actions against Bradley
 
 were
 
 village policy.
 
 Monell
 
 provides the applicable legal standard, and it is satisfied here.
 
 [6]
 

 Defendants here are not the first to argue that
 
 Parratt
 
 should excuse a municipality for acts of the municipality's policymakers. Although we have consistently reached outcomes that are in line with
 
 Monell
 
 (or rejected liability for non-constitutional violations when employees do not adhere to state-specific procedures), we have at times included the "random and unauthorized" language from
 
 Parratt
 
 to buttress those decisions. Such doctrinal confusion, however, should not be taken as authority to read our circuit precedent as creating a conflict with
 
 Monell
 
 and, as discussed further below, other Supreme Court § 1983 precedents.
 

 Most recently, in
 
 Breuder v. Board of Trustees of Community Coll. Dist. No. 502
 
 ,
 
 888 F.3d 266
 
 , 271 (7th Cir. 2018), we rejected the village's position here in a case where another senior public employee was fired. In
 
 Breuder
 
 , a community college board fired the college president using essentially the same maneuver the village board used to fire Bradley. The college board claimed that the president's contract was invalid under Illinois law because it extended beyond the terms of some board members.
 

 Id.
 

 at 268
 
 . Because the board viewed the contract as invalid, it took the position that the president had no right to any hearing.
 

 We rejected that argument. Under clearly established federal law, "a hearing is required whenever the officeholder has a 'legitimate claim of entitlement,' to keep the job."
 
 888 F.3d at 270
 
 , quoting
 
 Board of Regents v. Roth
 
 ,
 
 408 U.S. 564
 
 , 577,
 
 92 S.Ct. 2701
 
 ,
 
 33 L.Ed.2d 548
 
 (1972). (Recall that the village does not dispute that point regarding Bradley.) We then explained why a refusal to listen to the community college president regarding his contract violated due process:
 

 Breuder, who had a written contract for a term of years, assuredly had a legitimate
 
 claim
 
 of entitlement to have the Board honor its promise. The claim may have failed in the end, but that did not eliminate the claim's existence.
 

 .... Imagine the Board saying: "You have committed misconduct; therefore your tenure has ended; since you no longer have tenure, we need not offer you a hearing at which we have to demonstrate that misconduct occurred." The Supreme Court clearly established in
 
 Roth
 
 and its many successors that this maneuver won't work. A hearing is required to establish whether misconduct occurred. Just so here. The Board believes that Breuder's contract was invalid, making him an at-will employee ... or that the contract could be cancelled for misconduct. But
 
 whether
 
 the contract was valid was subject to legitimate debate, and a hearing would have allowed Breuder to articulate his position and insist that the contract be enforced. Both the duration of Breuder's tenure and the existence of misconduct ... were debatable subjects. The members who refused even to listen to him violated his clearly established rights.
 

 Id.
 
 at 270.
 

 Breuder
 
 squarely rejected a reading of
 
 Parratt
 
 identical to the village's argument here. We pointed out that even if the board had "contended that the process due for a summary termination is the opportunity to sue in state court"-the village's position here, it would lose: "When the decision is made by a body's governing board, it would be hard to contend that the action is random and unauthorized for the purpose of
 
 Parratt v. Taylor
 
 ,
 
 451 U.S. 527
 
 ,
 
 101 S.Ct. 1908
 
 ,
 
 68 L.Ed.2d 420
 
 (1981), and its successors."
 
 888 F.3d at 271
 
 .
 

 We have at times characterized this ground for "distinguishing"
 
 Parratt
 
 as giving
 
 Parratt
 
 a "narrow" construction (which is true, to the extent we have construed it to avoid conflict with
 
 Monell
 
 ). In
 
 Matthiessen v. Board of Education
 
 ,
 
 857 F.2d 404
 
 (7th Cir. 1988), for example, a school board fired a teacher who was assumed to be entitled to the extensive procedural protections under state law for tenured teachers. We rejected the board's argument that
 
 Parratt
 
 showed that its failure to use the procedures required by state law showed that its actions were "random and unauthorized":
 

 "Random and unauthorized" has been interpreted both narrowly and broadly. "Read narrowly it merely identifies the situation where a pre-deprivation remedy is infeasible because the officials authorized
 to grant such a hearing are unaware of the deprivation before it occurs." [
 
 Tavarez
 
 , 826 F.2d] at 677. This may be because "the person committing the unconstitutional act may be employed at such a low level of state or local government that the official authorized to grant a pre-deprivation hearing would be unaware of the person's actions."
 
 Wilson v. Civil Town of Clayton
 
 ,
 
 839 F.2d 375
 
 , 380 (7th Cir.1988). "Read more broadly, ...
 
 Parratt
 
 places beyond the reach of section 1983 any loss that 'is not a result of some established state procedure,'
 
 451 U.S. at 541
 
 ,
 
 101 S.Ct. 1908
 
 , ... even if the loss might have been averted by a predeprivation hearing."
 
 Tavarez
 
 ,
 
 826 F.2d at 677
 
 . In such a case the state cannot predict when a loss will occur.
 
 Wilson
 
 ,
 
 839 F.2d at 380
 
 .
 

 Under the narrow reading the Board's action is not random and unauthorized. The Board is the body that is authorized to grant hearings, and thus it cannot be unaware that a hearing was not provided. Likewise under the broad reading the Board's action was not random and unauthorized. It is true that the Board's alleged action was not pursuant to the School Code, but in contravention of it, and thus would seem not to be pursuant to established state procedure. However, the single act of a sufficiently high-ranking policymaker may equate with or be deemed established state procedure; therefore, here
 
 Parratt
 
 is inapposite even under the broad reading.
 
 Tavarez
 
 ,
 
 826 F.2d at
 
 677 ;
 
 Wilson
 
 ,
 
 839 F.2d at 381
 
 (defining "official policy" for the purpose of finding
 
 Monell v. New York City Dep't of Social Servs
 
 .,
 
 436 U.S. 658
 
 ,
 
 98 S.Ct. 2018
 
 ,
 
 56 L.Ed.2d 611
 
 (1978), satisfied and
 
 Parratt
 
 necessarily inapplicable). The Board's
 
 Parratt
 
 argument fails.
 

 857 F.2d at
 
 407 n.3.
 

 In
 
 Tavarez
 
 , we rejected a similar
 
 Parratt
 
 defense to a
 
 Monell
 
 claim. The plaintiffs owned a store where a gas heater malfunctioned, causing injuries to several people.
 
 826 F.2d at 673
 
 . Local officials evacuated and sealed the store. They kept it sealed for a month during winter. Because repairs could not be made, pipes burst and damaged the store and its inventory.
 

 Id.
 

 at 673-74
 
 . We recognized that officials could of course take emergency action to evacuate and seal the store. No predeprivation hearing was required for that step, and no one suggested otherwise.
 

 Id.
 

 at 674
 
 . The problem was the defendants' bureaucratic refusal to let the plaintiffs return after the emergency had passed and the officials' failure to provide plaintiffs with any opportunity to be heard as they were denied continuing access to the premises. The district court dismissed the plaintiffs' due process claim on the theory that
 
 Parratt
 
 rendered the deprivation "unauthorized," leaving plaintiffs to their tort remedies under state law.
 

 Id.
 

 at 674-75
 
 .
 

 We reversed on the claim against defendants who were assumed to have municipal policymaking authority in the matter.
 
 826 F.2d at 677-78
 
 . We explained that
 
 Parratt
 
 "does not place all
 
 ultra vires
 
 conduct beyond the reach of section 1983, but only conduct that occurs at such a low level of state or local government that it would be infeasible for the state to provide an opportunity for a hearing before the conduct occurred."
 
 Id
 
 . at 677. Even under a broader reading of
 
 Parratt
 
 , we explained, those defendants "cannot escape liability under section 1983 simply by exceeding the scope of their authority."
 
 Id
 
 . We reasoned that although
 
 Monell
 
 prohibits municipal liability "based on the doctrine of respondeat superior," if the municipal defendant (as head of the relevant agency) possessed "final authority to establish municipal policy," then "he
 
 was
 
 [the] County, in which
 event the county was a proper defendant, too."
 

 Id.
 

 at 677-78
 
 , citing
 
 Pembaur
 
 ,
 
 475 U.S. 469
 
 ,
 
 106 S.Ct. 1292
 
 ,
 
 89 L.Ed.2d 452
 
 .
 

 We offered a different basis for importing language from
 
 Parratt
 
 into the municipal context in
 
 Michalowicz v. Village of Bedford Park
 
 ,
 
 528 F.3d 530
 
 (7th Cir. 2008), but that basis is similarly inadequate to support the village's argument here. In
 
 Michalowicz
 
 a village fire inspector was fired for conflicts of interest. Before he was fired, he was given written notice that he was in danger of being fired, along with a statement of the reasons. He was interviewed twice by village officials and then received an additional letter regarding the possible firing, along with a notice of hearing and a document listing the charges and statutes he allegedly violated.
 

 Id.
 

 at 533
 
 . At the hearing he was accompanied by his attorney, who made a statement on his behalf. The plaintiff was also given notice of post-termination process, including a hearing at which he presented evidence and witnesses, as well as cross-examined the witnesses against him.
 
 Id
 
 .
 

 In
 
 Michalowicz
 
 , the village easily cleared the constitutional hurdle for predeprivation due process. The plaintiff's complaint that a local ordinance entitled him to a more thorough explanation of the incriminating evidence is not cognizable as a constitutional violation.
 
 528 F.3d at 537-38
 
 . The crux of the case was that the plaintiff was trying to enforce under the United States Constitution a particular detail of state or local procedural law. That simply does not work, for reasons we have explained in
 
 Schultz v. Baumgart
 
 ,
 
 Wallace v. Tilley
 
 ,
 
 Osteen v. Henley
 
 ,
 
 Archie v. City of Racine
 
 , and many other cases. See cases discussed above at 883 & n.3. Our decision in
 
 Michalowicz
 
 regarding plaintiff's pretermination process was fully in accord with this analysis, and we did not cite or refer to
 
 Parratt
 
 .
 

 Id.
 

 at 536-38
 
 .
 

 With respect to his post-termination hearing, the plaintiff in
 
 Michalowicz
 
 similarly tried to enforce under the federal Constitution a specific provision of a local ordinance limiting who could serve as a decision-maker-another procedural detail not mandated by the federal Constitution.
 
 528 F.3d at 534-35
 
 . We cited the
 
 Parratt
 
 doctrine in that portion of
 
 Michalowicz
 
 , but we did not cite it on the theory that top-level municipal officials are excused from liability when they violate both state law and federal due process rights, which is the village's position here. Instead, we cited
 
 Parratt
 
 because of the "inherently unpredictable" nature of the specific kind of procedural missteps in
 
 Michalowicz
 
 -assigning a post-termination hearing to the wrong municipal body.
 
 Id
 
 .
 

 The dissent asserts: "The substance of Bradley's claim"-i.e., a constitutional violation-compared to Michalowicz's claim-i.e., failure to follow state procedures-"is simply irrelevant under the
 
 Parratt
 
 doctrine." Post at 913-. To the contrary, the substance of that claim is decisive. To reiterate,
 
 Michalowicz
 
 involved the sorts of "procedural details" of state and local law which, even if violated, do not violate the federal constitutional standards for due process that are enforceable via § 1983-notice and an opportunity to be heard before firing. State and local laws often provide very detailed procedures for terminating public officials and employees. As we have noted so often, those procedural details of those state and local laws simply are not matters of federal due process. Where the plaintiff received the constitutionally required notice and opportunity to be heard before termination, and a more extensive hearing afterward, the "remedies guaranteed by state law" in state court were enough to protect against the kind of state-law mistakes that happened in
 
 Michalowicz
 
 .
 
 528 F.3d at 535
 
 , quoting
 
 Doherty
 
 , 75 F.3d at 323 ; see also
 
 Cannici v. Village of Melrose Park
 
 ,
 
 885 F.3d 476
 
 , 479-80 (7th Cir. 2018) (affirming decision applying
 
 Michalowicz
 
 where plaintiff complained that hearing was not fair).
 

 The village's argument here, however, asks us to stretch well beyond that limited point about the differences between detailed state-law procedural requirements and the minimum federal constitutional requirements in
 
 Michalowicz
 
 and
 
 Schultz
 
 . The village would have us hold that
 
 Parratt
 
 excuses a municipality from liability when its top officials decide as a matter of village policy to ignore an employee's due process rights completely. This unnecessary and expansive reading of
 
 Parratt
 
 -as we discuss next-runs contrary to the core procedural due process cases for public employees like
 
 Roth
 
 and
 
 Loudermill
 
 and their progeny, as well as other lines of Supreme Court precedent.
 

 C.
 
 Parratt and the Supreme Court's Other § 1983 Precedents
 

 Recall that
 
 Zinermon
 
 explicitly rejected the argument the village makes here for applying
 
 Parratt
 
 and highlighted the rule's lineage as consistent with, not contrary to, existing § 1983 precedent:
 

 Contrary to the dissent's view of
 
 Parratt
 
 and
 
 Hudson
 
 , those cases do not stand for the proposition that in every case where a deprivation is caused by an "unauthorized ... departure from established practices,"
 
 post
 
 , at 146, state officials can escape § 1983 liability simply because the State provides tort remedies. This reading of
 
 Parratt
 
 and
 
 Hudson
 
 detaches those cases from their proper role as special applications of the settled principles expressed in
 
 Monroe
 
 and
 
 Mathews
 
 .
 

 494 U.S. at
 
 138 n.20,
 
 110 S.Ct. 975
 
 . Here, too, the defense theory overlooks the limits of the narrow and pragmatic rationales of
 
 Parratt
 
 and
 
 Hudson
 
 and seeks to extend them in ways that would undermine other principles and precedents governing § 1983 cases.
 

 Defendants' broad reading of
 
 Parratt
 
 would also undermine the bedrock of § 1983 jurisprudence,
 
 Monroe v. Pape
 
 ,
 
 365 U.S. 167
 
 , 172, 187,
 
 81 S.Ct. 473
 
 ,
 
 5 L.Ed.2d 492
 
 (1961), which held that the statute offers a remedy for actions "under color of" state law even if the actions violate state law. As we explained in
 
 Wilson
 
 , "virtually no interference with property would be actionable in federal court under § 1983" if
 
 Parratt
 
 were extended to cover every
 
 ultra vires
 
 tort of a public official or agency because "ordinary state judicial remedies for torts" exist for many kinds of property deprivation.
 
 839 F.2d at 379
 
 . "The Supreme Court could not have meant to deny every § 1983 plaintiff his or her day in federal court, no matter how egregious the constitutional violation, simply because of the availability of a similar state tort action."
 

 Id.
 

 Such an approach would mistakenly read the first requirement of
 
 Parratt
 
 -"impracticability"-out of the opinion. See
 
 451 U.S. at 540-41
 
 ,
 
 101 S.Ct. 1908
 
 .
 

 Defendants' theory also runs into the line of § 1983 precedent capped by
 
 Patsy v. Board of Regents
 
 ,
 
 457 U.S. 496
 
 ,
 
 102 S.Ct. 2557
 
 ,
 
 73 L.Ed.2d 172
 
 (1982). Patsy was a state employee, at a state university. She alleged that her employer had violated her constitutional rights by discriminating on the basis of race and sex, and she sued under § 1983. The district court had dismissed her claims because she had failed to exhaust available state administrative remedies. The Fifth Circuit had affirmed. The Supreme Court reversed, holding that a § 1983 claim should not be dismissed for failure to exhaust available state administrative or judicial remedies.
 
 Id
 
 . at 500-01,
 
 102 S.Ct. 2557
 
 (collecting the "numerous"
 

 cases in which the Court had already "rejected th[is] argument"). The broad reading of
 
 Parratt
 
 urged by defendants here seeks to impose, in effect, the kind of exhaustion requirement rejected in
 
 Patsy
 
 .
 
 [7]
 

 Conclusion
 

 Bradley has alleged a due process claim that follows the mainstream of due process law for public employees with for-cause protection: he was summarily fired, without notice or an opportunity to be heard before he was fired (or even after he was fired). The village does not dispute these points. The village's
 
 Parratt
 
 defense fails because it reads
 
 Parratt
 
 far too broadly, in a way that would conflict with
 
 Monroe
 
 ,
 
 Zinermon
 
 ,
 
 Monell
 
 ,
 
 Patsy
 
 , and substantial precedent of this court. The judgment of the district court is REVERSED and the case is REMANDED for proceedings consistent with this opinion.
 

 This case does not present any issues concerning genuine emergencies.
 
 Hodel v. Virginia Surface Mining & Reclamation Ass'n
 
 ,
 
 452 U.S. 264
 
 , 300,
 
 101 S.Ct. 2352
 
 ,
 
 69 L.Ed.2d 1
 
 (1981) (explaining the "emergency situation exception to the normal rule that due process requires a hearing prior to deprivation of a property right");
 
 Tavarez v. O'Malley
 
 ,
 
 826 F.2d 671
 
 , 674, 677 (7th Cir. 1987).
 

 This fact distinguishes Bradley's case from the same village's firing of its village manager, also in May 2015. See
 
 Linear v. Village of University Park
 
 ,
 
 887 F.3d 842
 
 , 843-44 (7th Cir. 2018) (finding that plaintiff failed to state due process claim because he did not have property interest in his tenure as village manager). The village has expressly waived on appeal any arguments it might have made to the contrary. See Appellees' Br. at 14, 23-24.
 

 Our cases reiterating this principle are legion. See, e.g.,
 
 Martin v. Shawano-Gresham School Dist.
 
 ,
 
 295 F.3d 701
 
 , 706 (7th Cir. 2002) ("the failure to conform with the procedural requirements guaranteed by state law does not by itself constitute a violation of federal due process");
 
 Wallace v. Tilley
 
 ,
 
 41 F.3d 296
 
 , 301 (7th Cir. 1994) (holding that "denial of state procedures in and of itself does not create inadequate process under the federal constitution" because constitutional requirements are satisfied with sufficient predeprivation notice and an opportunity for a hearing-even if plaintiff did not have an attorney present at the hearing, and such hearing was not conducted by an impartial decision-maker);
 
 Osteen v. Henley
 
 ,
 
 13 F.3d 221
 
 , 225 (7th Cir. 1993) ("As we tirelessly but unavailingly remind counsel in this court, a violation of state law ... is not a denial of due process, even if the state confers a procedural right. ... The standard of due process is federal.");
 
 Archie v. City of Racine
 
 ,
 
 847 F.2d 1211
 
 , 1216-17 (7th Cir. 1988) (en banc) ("Once state law defines the substance [of the property right], constitutional law establishes the minimum procedures. ... [But] violation of state law is not itself the violation of the Constitution.").
 

 Easter House
 
 held that the high rank of a state official does not provide a
 
 per se
 
 bar to application of
 
 Parratt
 
 . It would be unwarranted, however, to read
 
 Easter House
 
 as also announcing a
 
 per se
 
 rule that the existence of a state law at odds with a high state official's actions
 
 mandates
 
 application of
 
 Parratt
 
 . Such a reading is not grounded in the facts present in
 
 Easter House
 
 , and it would conflict with broader Supreme Court jurisprudence, as discussed below.
 

 Since
 
 Easter House
 
 did not address
 
 Monell
 
 or claims against municipal governments or employees, our dissenting colleague's emphasis here on the perspective of the
 
 State of Illinois
 
 , in a case against a local government and its policymakers, misses the limits of
 
 Easter House
 
 . See post at 903 & 905-06. In addition, the
 
 Easter House
 
 majority did not reject
 
 Matthiessen
 
 ,
 
 Wilson
 
 , and
 
 Tavarez
 
 , despite the opportunity to do so.
 

 The defendants also cite cases in which we held that a plaintiff must challenge the adequacy of the required state procedures in order to hold the government entity liable for its employees' due process violations. These cases did not involve complaints about a municipality's formal policy or an employee with policymaking authority, so there could have been no municipal liability under
 
 Monell
 
 . See
 
 Gable v. City of Chicago
 
 ,
 
 296 F.3d 531
 
 , 535, 537, 539-40 (7th Cir. 2002) (city employees damaged and stole from impounded vehicles in violation of city policy; plaintiffs "concede that their injuries did not result from the application of an express policy or from any particular act of an individual with policymaking authority," and there was no evidence the employees' actions could be considered "City customs");
 
 Doherty v. City of Chicago
 
 ,
 
 75 F.3d 318
 
 , 321, 323-24 (7th Cir. 1996) (bingo hall operator alleged she was overcharged for bingo license and was improperly denied a permit due to political bias and neighborhood opposition; although
 
 Monell
 
 is not cited, there was no allegation that the city employees who charged the licensing fee and issued permits had any policymaking authority or were acting pursuant to city custom). In addition,
 
 Hamlin v. Vaudenberg
 
 ,
 
 95 F.3d 580
 
 , 582-85 (7th Cir. 1996), is inapposite on all scores: (1) there was a state, not municipal, defendant; (2) the plaintiff inmate's sole allegation was that state prison officials did not comply with state procedures-which is not a constitutional due process claim, see above at 883 & n.3; and (3) the defendants were entirely "without discretionary power." On a different footing,
 
 Germano v. Winnebago County
 
 ,
 
 403 F.3d 926
 
 , 929 (7th Cir. 2005), affirmed dismissal of a class action challenging a county board's class-wide legislation regarding health insurance for retired sheriff deputies that was inconsistent with state insurance provisions. We did so without citing
 
 Monell
 
 or our cases rejecting application of
 
 Parratt
 
 to
 
 Monell
 
 claims, and we directed plaintiffs to their state remedies. We reasoned that the state "could not have predicted or prevented" the county's action, and thus the county's actions were unauthorized. In any event, the result in
 
 Germano
 
 was certainly correct. When legislatures enact such class-wide legislation that arguably impairs individuals' property rights, the legislative process provides the procedures that are due, though individuals harmed by legislation may still have takings claims in some cases. See generally
 
 Atkins v. Parker
 
 ,
 
 472 U.S. 115
 
 , 129-30,
 
 105 S.Ct. 2520
 
 ,
 
 86 L.Ed.2d 81
 
 (1985) (legislation changed eligibility for federal food stamps);
 
 Logan v. Zimmerman Brush Co
 
 .,
 
 455 U.S. 422
 
 , 432-33,
 
 102 S.Ct. 1148
 
 ,
 
 71 L.Ed.2d 265
 
 (1982) (collecting cases where "the legislative determination provides all the process that is due").
 

 The Supreme Court had recognized one exception to
 
 Patsy
 
 , when a plaintiff claims that her property has been taken for a public purpose but without just compensation. See
 
 Williamson Cty. Reg'l Planning Com'n v. Hamilton Bank
 
 ,
 
 473 U.S. 172
 
 , 192-93,
 
 105 S.Ct. 3108
 
 ,
 
 87 L.Ed.2d 126
 
 (1985). The Supreme Court recently overruled that holding in an opinion that noted again in passing the narrow, pragmatic view of
 
 Parratt
 
 . See
 
 Knick v. Township of Scott
 
 , --- U.S. ----,
 
 139 S. Ct. 2162
 
 , 2174, --- L.Ed.2d ---- (2019).